William J. BELANGER, Jr.; Louise H. Belanger; Bruce C. Belanger; Kristen E. Belanger, Defendants, Appellants,

v.

## NORTH AMERICAN SPECIALTY INSURANCE COMPANY, Plaintiff, Appellee.

No. 07–1497.

United States Court of Appeals, First Circuit.

Submitted Sept. 27, 2007.

Decided Oct. 2, 2007.

---

Francis X. Quinn and Boynton, Waldron, Doleac, Woodman & Scott, P.A. on brief for appellants.

Bradford R. Carver, Eric H. Loeffler, and Hinshaw & Culbertson LLP on brief for appellee.

Before LYNCH, Circuit Judge, STAHL, Senior Circuit Judge, and OBERDORFER,* Senior District Judge.

STAHL, Senior Circuit Judge.

This dispute between a construction company, the individual owners of the company, and the company's surety bond provider arose out of a construction project that went awry. Plaintiff North American Specialty Insurance Company ("NAS") is an Illinois corporation in the business of issuing performance and payment bonds on behalf of contractors, to guarantee their performance on construction projects. Seacoast Crane Co. ("Seacoast") is a construction company and defendants William J. Belanger, Jr., Louise H. Belanger, Bruce C. Belanger, and Kristen E. Belanger (the "Belanger Defendants" or "Belangers") are its principals. The Belanger Defendants appeal a grant of summary judgment to NAS. NAS brought suit against Seacoast and the Belangers to recover monies paid out pursuant to a performance bond issued by it on behalf of Seacoast to the DCC Development Corporation ("DCC"), after problems arose with a project that DCC had contracted Seacoast to build. After cross-motions for summary judgment, the district court ruled in favor of NAS on its claim for indemnification from the Belangers.[1] We affirm.

## I. Background

In March of 1995, Seacoast and the Belanger Defendants executed an Agreement of Indemnity ("Agreement") in favor of NAS. Subsequently, Seacoast was hired by DCC to perform construction work on a corporate headquarters in Seabrook, New Hampshire. In connection with that project, NAS issued a performance bond (the "NAS Bond") on behalf of Seacoast, as principal, for the benefit of DCC, as obligee. Seacoast subcontracted construction of the headquarters' parking lot to H.L. Smith ("Smith"). Another surety bond provider, Amwest Surety Insurance Company ("Amwest"), issued a performance and payment bond (the "Amwest Bond") to guarantee the performance of the parking lot subcontractor, this time with Smith as the principal and Seacoast as the obligee.

Problems with the construction of the parking lot ensued, and on November 13, 2000, after failed settlement negotiations,

* Of the District of Columbia, sitting by designation.

1. The district court also granted defendants' cross-motion for summary judgment with respect to defendant Seacoast only, holding that a March 22, 2006 decision of the Maine Superior Court (York County), which absolved Seacoast of liability to NAS pursuant to the Maine Insurance Guaranty Association Act, collaterally estopped NAS's claims against Seacoast in this action. NAS does not appeal from that decision.

DCC filed suit against NAS and Seacoast in the New Hampshire Superior Court for the County of Rockingham, alleging breach of contract and making a claim on the NAS Bond. On December 30, 2002, the Rockingham Superior Court entered judgment holding both Seacoast and NAS liable to DCC and finding Seacoast entitled to indemnification from Smith.[2] A court of competent jurisdiction, however, had declared Amwest insolvent in June 2001, and so Seacoast was unable to claim the benefits of the Amwest Bond. Nevertheless, NAS demanded that Seacoast and the Belanger Defendants indemnify it, pursuant to the Agreement, against the judgment of the Rockingham Superior Court. In June 2004, NAS paid the entire amount ordered by the Rockingham Superior Court to satisfy the judgment in that case. Despite NAS's demand for indemnification, Seacoast and the Belanger Defendants did not pay out any monies to satisfy that judgment and refused to reimburse NAS for its loss.

In September 2004, NAS brought claims for indemnification, breach of contract, and specific performance against Seacoast and the Belanger Defendants in the United States District Court for the District of Maine and subsequently moved for summary judgment against the Belangers on its indemnification claims. Defendants cross-moved for summary judgment on all claims, with Seacoast asserting that the March 22, 2006 order of the Maine Superior Court (York County) collaterally estopped NAS's claims against Seacoast. The District Court granted summary judgment for Seacoast on the basis of collateral estoppel, but otherwise denied Defendants' motion for summary judgment and granted summary judgment for NAS.

## II. Discussion

We review the district court's grant of summary judgment *de novo*, with all reasonable inferences resolved in favor of the nonmoving party. *See Fenton v. John Hancock Mut. Life Ins. Co.*, 400 F.3d 83, 87 (1st Cir.2005). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

The Belanger Defendants' arguments on appeal attempt to obfuscate what is in reality a straightforward case. They do not dispute the key facts: (1) NAS suffered a loss as a result of a claim made by DCC upon the NAS Bond, and (2) a valid indemnity agreement existed between Seacoast and the Belanger Defendants, as indemnitors, and NAS, as the surety provider, which obligated the indemnitors to hold NAS harmless against any losses or expenses incurred as a result of its issuance of surety bonds on the indemnitors' behalf. Rather, the Belanger Defendants argue that NAS's admittedly otherwise valid claim for indemnification is barred by the Maine Insurance Guaranty Association Act (the "MIGA Act" or the "Act").

The MIGA Act created a non-profit, unincorporated entity known as the Maine Insurance Guaranty Association ("MIGA"), in order to protect claimants or policyholders from financial losses incurred by insurer insolvencies. *See* 24-A M.R.S.A. § 4432. Certain types of insurers are required to join MIGA and pay assessments to the Association as a condition of doing business in Maine. When an insurer becomes insolvent, MIGA uses the assessment monies collected to provide for the

---

**2.** The December 2002 judgment awarded DCC damages of $124,325.00. On December 9, 2003, the Rockingham Superior Court entered an order and final judgment awarding attorneys' fees in addition to the damage award.

payment of "covered claims."[3] *See* 24–A M.R.S.A. §§ 4432, 4438; *see also Pinkham v. Morrill,* 622 A.2d 90, 92–93 (Me.1993).

The Belanger Defendants are not entitled to the protection of the MIGA Act because they are not "claimants [under] or policyholders" of a policy issued by an insolvent insurer. The only insolvent insurer relevant to this case is Amwest, and the Amwest Bond names only Seacoast as obligee. The Maine Superior Court held in its March 22, 2006 decision that Seacoast had the benefit of the MIGA Act against the indemnification claims of NAS, because Seacoast was the policyholder of a policy issued by an insurer that became insolvent at the relevant time. Nothing in the record indicates that the Belanger Defendants were similarly situated;[4] in fact, they did not contend before the district court or on appeal to be a claimant under or policyholder of the Amwest Bond.[5]

Indeed, the Belanger Defendants admit that they are not even raising a third party beneficiary claim, but rather argue that they have a "beneficial interest" in the Amwest Bond. This is not a right recognized by the MIGA Act. The plain language of the statute and relevant Maine case law clearly indicate that the Act is "intended ... to protect the insured of insolvent insurers from financial loss due to the insolvency of an insurer to the ex-tent that the insureds are subject to 'covered claims.'" *Pinkham v. Morrill,* 622 A.2d 90, 95 (Me.1993). The Belanger Defendants are not insureds of an insolvent insurer; thus any claim against them cannot be a "covered claim." The Defendants' attempt to twist the statutory language to apply to parties in their position is unavailing.

The Belanger Defendants' public policy argument also fails. Contrary to the Belangers' contention that the "express purpose" of the Act is to protect members of the public from the costs associated with an insolvent insurer and to assess those associated costs among member insurance companies, the statutory language and legislative record plainly demonstrate that the "express purpose behind the bill is to protect the policy holders of insolvent insurance companies." *Pinkham,* 622 A.2d at 94. The MIGA Act was not created to protect each and every individual who, by some highly attenuated chain of causation, may be financially impacted by an insurer insolvency. Broadening the interpretation of the Act in the manner urged by the Belanger Defendants would in fact be inconsistent with public policy in that it would upset the legislature's careful allocation of the extent of the cost of insurer insolvencies that can fairly be borne by other, solvent insurers.

---

**3.** The Act defines "covered claim" as:
> ... an unpaid claim, including one for unearned premiums but excluding one for punitive damages, arising under and within the coverage and applicable limits of a policy of a kind of insurance referred to in section 4433 to which this subchapter applies issued by an insurer that becomes an insolvent insurer after May 9, 1970 and where: A. The claimant or insured is a resident of this State at the time of the insured event; or B. The property from which the claim arises is permanently located in this State.

24–A M.R.S.A. § 4435(4).

**4.** The Belanger Defendants could have avoided this problem. Had the Belanger Defendants negotiated to be included on the Amwest Bond as an obligee, they may have fallen under the protection of the MIGA Act. Similarly, had the Belanger Defendants not agreed individually to indemnify NAS, NAS would not have an action against them now.

**5.** In response to a declaratory judgment action filed by MIGA, the March 22, 2006 Maine Superior Court decision held that MIGA had no obligation toward Seacoast because DCC's claim had already been paid by NAS.

### III. Conclusion

For the foregoing reasons, we affirm the summary judgment order of the district court.

*Affirmed.*